**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| THOMPSON DISTRIBUTION, on behalf of itself and all others similarly situated, | ) ) ) ) | Civil Action No.: |
| Plaintiff, | ) ) ) | CLASS ACTION COMPLAINT FOR DAMAGES |
| SIGMA CORPORATION, McWANE, INC. and STAR PIPE PRODUCTS, LTD., | ) ) ) ) ) | TRIAL BY JURY DEMANDED |
| Defendants. | ) ) | |

1.     Thompson Distribution (the "Plaintiff"), by its undersigned attorneys, brings this action against Defendants (defined below) based on their artificial inflation and manipulation of the prices of ductile iron pipe fittings ("DIPF") in violation of the Sherman Act, 15 U.S.C. § 1.

2.     Plaintiff's allegations as to itself and its own actions are based upon personal knowledge, and as to all other matters, upon information obtained during the course of its attorneys' investigation, including, but not limited to, the analysis and review of: (a) public news reports concerning pending investigations of manipulation in the markets for foreign and domestic DIPF; (b) complaints filed against the Defendants by the United States Federal Trade Commission ("FTC") (the "FTC Complaints"); and (c) the Decision and Order entered by the FTC against Sigma Corporation, as set forth below.

I.      NATURE OF THE ACTION

3.      As detailed herein and alleged in the FTC Complaints, the Defendants conspired to and did manipulate the prices for DIPF.  Beginning in January 2008 and continuing until early 2009 (the "All DIPF Class Period"), McWane, Inc. (McWane"), Star Pipe Products, Ltd. ("Star Pipe") and Sigma Corporation ("Sigma"), conspired to artificially raise and stabilize the prices at which DIPF were sold in the United States.  Their scheme included, *inter alia*, the active exchange of current sales data in order to facilitate their agreed upon price coordination.

4.      Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA") in February 2009.  Pursuant to the ARRA, Congress allocated more than $6 billion to water infrastructure projects, conditioned on the use of domestically produced materials, including DIPF, in those projects (the "Buy American Requirement").  The passage of the ARRA acted to significantly alter the competitive environment of the DIPF industry, and upset the manipulative price coordination terms previously agreed upon among, and effectuated by, the Defendants.

5.      At the time of the passage of the ARRA, McWane was the only co-conspirator that supplied a full line of domestically produced DIPF in the most commonly used size ranges. Following passage of the ARRA and its Buy American Requirement, Sigma, Star Pipe and other companies determined to enter the domestic DIPF market in direct competition with McWane.

6.      In response to this changed dynamic in the market for domestic DIPF, beginning in 2009 and continuing to the present (the "Domestic DIPF Class Period") McWane attempted to and did act to maintain its monopoly in the domestic DIPF market through

exclusionary conduct, including, *inter alia*: (a) entering into a distribution agreement with Sigma that eliminated Sigma as an actual potential entrant into the domestic DIPF market; and (b) excluding actual and potential competitors, including Star Pipe, through the adoption and enforcement of exclusive dealing policies.

7.      As detailed herein, Defendants' conduct during the Class Periods has restrained competition and led to higher prices for both imported and domestically produced DIPF.

## II.     PLAINTIFF

8.      Plaintiff Thompson Distribution has its principal place of business in Indianapolis, Indiana.  During the All DIPF Class Period, Plaintiff purchased DIPF at supra-competitive prices directly from one or more of the Defendants.  Likewise, during the Domestic DIPF Class Period, Plaintiff purchased domestic DIPF at supra-competitive prices from one or more manufacturer of domestic DIPF.  Plaintiff has been injured as a result of Defendants' illegal conduct as alleged herein.

## III.    DEFENDANTS

9.      Defendant Sigma Corporation ("Sigma") is a New Jersey corporation, with its principal place of business located at 700 Goldman Drive, Cream Ridge, New Jersey 08154. Sigma imports, markets and sells DIPF throughout the United States.

10.     Defendant McWane, Inc. ("McWane") is a Delaware corporation, with its principal place of business located at 2900 Highway 280, Suite 300, Birmingham, Alabama 35223.  McWane imports, markets and sells DIPF throughout the United States.

11.     Defendant Star Pipe Products, Ltd. ("Star Pipe") is a Texas limited partnership, with its principal place of business located at 4018 Westhollow Parkway, Houston, Texas 77082. Star Pipe imports, markets and sells DIPF throughout the United States.

12.     Sigma, McWane and Star Pipe are collectively referred to herein as the "Defendants."

## IV.     AGENTS AND CO-CONSPIRATORS

13.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

14.     Various persons and/or firms not named as Defendants herein may have also participated as co-conspirators in the violations alleged herein, and/or may have performed acts and made statements in furtherance thereof.

15.     In addition, one or more of the Defendants may have acted as the principal or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

## V.     JURISDICTION AND VENUE

16.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26a.

18.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §§ 139l(b), (c), and (d).  The Plaintiff resides and one or more of the Defendants transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of affected interstate trade and commerce described herein has been carried out in this District.

## VI.     THE RELEVANT MARKETS

19. The relevant product markets in which to evaluate Defendants' conduct are:

a.      DIPF for projects in the United States not specified as domestic only; and

b.      DIPF for projects in the United States specified as domestic only.

20.     There are no widely used substitutes for DIPF, and no other product significantly constrains the prices of DIPF.

## VII.    FACTUAL ALLEGATIONS

### A.     The DIPF Industry

21.     DIPF are a common component of pipeline systems used to transport drinking and waste water under pressurized conditions in, for example, municipal distribution systems and treatment plants.  DIPF are used to join pipes, valves and hydrants in straight lines, and to change, divide or direct the flow of water.  The end users of DIPF are typically municipalities and regional water authorities.

22.     Independent wholesale distributors such as Plaintiff, known as "waterworks distributors," are the primary means and source of distribution of DIPF to end users.  Plaintiff and other waterworks distributors specialize in distributing products for water infrastructure projects, and generally handle a full spectrum of waterworks products, including pipes, DIPF, valves and hydrants.

23.     Direct sales of DIPF to end users, or to the utility contractors that often serve as the agent of end users in purchasing and installing DIPF, are uncommon.  End users and DIPF suppliers alike typically work through waterworks distributors, such as Plaintiff, with locations near project sites.  As a result, DIPF suppliers, such as the Defendants, sell DIPF to local waterworks distributors in each region of the country in order to compete effectively in that region.

24.     The end user of DIPF specifies whether, on a particular project, it will accept both imported and domestically produced DIPF, or only domestically produced DIPF.  This specification is often mandated by municipal code, or by state or federal law, such as the ARRA.

25.     Both imported and domestically produced DIPF are commercially available.   All of the Defendants sell imported DIPF.  At the time of the passage of the ARRA, McWane was the sole supplier of a full line of domestically produced small and medium-sized DIPF.

**B.     The Defendants Formed a Conspiracy to Manipulate DIPF Prices**

26.     Beginning in January 2008, the Defendants conspired and agreed to raise and stabilize the prices at which DIPF were sold in the United States.

27.     According to the FTC Complaints, as the result of rising input costs, the Defendants desired price increases in 2008.  However, McWane was concerned that, absent an agreement, co-conspirators Sigma and Star Pipe would not adhere to announced price increases, putting McWane at risk of loss of profit and market share if it unilaterally implemented price increases.  To ensure that all of the Defendants adhered to any agreed-upon price increases and pricing terms, the Defendants conspired to, and agreed among themselves to work together to maintain higher prices.

28.     On January 11, 2008, McWane publicly announced the first DIPF price increase of 2008.  Pursuant to the conspiracy and agreement, Sigma and Star Pipe agreed to and adopted this price increase.

29.     The January 2008 price increase was the result of a combination and conspiracy among the Defendants.  According to the FTC Complaints, before announcing the January 2008 price increase, the Defendants agreed to specific changes to the business methods of Sigma and

Star Pipe that would reduce the risk that local sales personnel for these companies would sell DIPF at prices lower than McWane's published levels.

30.     McWane, acting with the intent to conspire with Sigma and Star Pipe to restrain price competition, communicated the terms of the proposed plan to its co-conspirators.  In accordance with their agreement, Sigma and Star Pipe, manifesting their understanding and acceptance of McWane's offer, publicly took steps to limit their discounting from published price levels in order to induce McWane to support higher price levels.

31.     According to the FTC Complaints, on or about March 10, 2008, McWane and Sigma executives discussed by telephone their efforts to implement the January 2008 price increase.

32.     On June 17, 2008, McWane publicly announced the conspirator's second DIPF price increase of the year.  Pursuant to the parties' agreement and scheme, Sigma and Star Pipe adopted and implemented this price increase.  The adherence to the June 2008 price increase by the Defendants was the result of the agreement, combination and conspiracy among them.

33.     Pursuant to the scheme, before announcing the June 2008 price increase, the Defendants agreed to exchange information from each other, documenting the volume of their monthly sales of DIPF.  This exchange of information was to be achieved under the auspices of an entity styled the Ductile Iron Fittings Research Association ("DIFRA").

34.     McWane communicated the terms of the plan to Sigma and Star Pipe, at least in part, through a public letter sent by McWane to waterworks distributors, the common customers of the Defendants.  According to the FTC Complaints, a section of that letter was meaningless to distributors, but was intended to, and did inform Sigma and Star Pipe of the terms of McWane's

offer.  McWane acted with the intent of conspiring with Sigma and Star Pipe to restrain price competition.

35.     Sigma and Star Pipe manifested their understanding and acceptance of McWane's offer and agreement to enter into the pricing scheme by, *inter alia*, initiating their participation in the DIFRA information exchange.  McWane then led a price increase, which, pursuant to their agreement and manipulative scheme, Sigma and Star Pipe followed and adopted.

36.     According to the FTC Complaints, on or about August 22, 2008, executives of McWane and Sigma had further discussions by telephone related to their efforts to implement the June 2008 price increase.

### C.     Defendants Institute the DIFRA to Facilitate Price Coordination

37.     The DIFRA information exchange instituted by the Defendants was intended to, and did operate as follows.  Pursuant to their agreement and scheme, each of the Defendants submitted reports of its previous month's sales to an accounting firm.  Shipments were reported in tons shipped, subdivided by diameter size range (*e.g.*, 2 to12 inches) and joint type.  Data submissions were aggregated, and then provided to each of the Defendants.  Data submitted to the accounting firm was typically no older than 45 days, and the summary reports provided to each of the Defendants contained current data, typically no more than two months old.

38.     During its operation between June 2008 and January 2009, the DIFRA information exchange served its intended purpose and function of enabling each of the Defendants to determine, track and monitor its own market share and the output levels of each co-conspirator.  In this way, the DIFRA information exchange facilitated price coordination among the Defendants on the pricing of DIPF.

39.     The acts and practices of the Defendants, as alleged herein, had the purpose, capacity, tendency, and effect of: (i) fixing, maintaining and raising prices of DIPF in the relevant DIPF market; and (ii) facilitating collusion by the Defendants in the relevant DIPF market.

40.     There were no legitimate pro-competitive efficiencies that justified the conduct of the Defendants as alleged herein, or that outweigh its anti-competitive effects.

**D.     McWane and Sigma Continued the Scheme after Enactment of the ARRA**

41.     In February 2009, Congress passed the American Recovery and Reinvestment Act of 2009 ("ARRA").  Pursuant to the ARRA, Congress allocated more than $6 billion to water infrastructure projects, conditioned on the Buy American Requirement, which required the use of domestically produced materials, including DIPF, in those projects.  The passage of the ARRA, with its Buy American Requirement, acted to significantly alter the competitive environment of the DIPF industry, and upset the manipulative price coordination terms and agreement previously agreed upon among, and effectuated by the Defendants.

42.     At the time of the enactment of the ARRA and thereafter (the Domestic DIPF Class Period), McWane possessed monopoly power in the relevant domestic DIPF market due to the fact that it was the only manufacturer of a full line of small and medium sized DIPF in – and controlled nearly 100 percent of – the relevant domestic DIPF market.

43.     McWane's monopoly power in the relevant domestic DIPF market at this time was protected by, *inter alia*, substantial barriers to effective entry and expansion, including the unfair methods of competition of McWane and Sigma, as alleged in Paragraphs 44 through 63, below.

44.     McWane's monopoly power in the relevant domestic DIPF market, enhanced by its scheme and agreement with Sigma detailed below, was reflected, and directly demonstrated

by its ability to exclude competitors, to control prices, and to coercively impose unwanted distribution policies on its customers.

25.     Federal stimulus, in the form of the ARRA, gave Sigma, Star Pipe, and other imported DIPF suppliers, an incentive to enter the domestic DIPF market.

45.     Sigma and Star Pipe each initially pursued separate entry into the relevant domestic DIPF market in response to the passage of the ARRA.  In response, McWane sought to, and acted to maintain its monopoly position and power in that market by, *inter alia*, illegally inducing Sigma to abandon its effort independently to enter the domestic DIPF market, and instead to join with McWane in implementing an exclusive dealing policy to control pricing and prevent other competitors from entering or expanding in that market.  Through this unlawful conduct, McWane and Sigma intended to, and were able to maintain pricing and eliminate and/or delay competition from other firms with the ability and incentive to enter the relevant domestic DIPF market in a timely fashion.  McWane acted with the specific intent to monopolize the relevant domestic DIPF market.

46.     According to the FTC Complaints, after the enactment of the ARRA, Sigma initially took steps consistent with independently entering into domestic production of DIPF, including but not limited to:

a.      formulating a complete or nearly complete operational plan;

b.      arranging for an infusion of equity capital to fund domestic production;

c.      obtaining the approval of its Board of Directors for its entry plans; and

d.      casting prototype product.

47.     McWane perceived that Sigma was preparing to enter the relevant domestic DIPF market, and acted both to eliminate the risk of direct competition from Sigma and to enhance its

own monopoly position and to control pricing by inducing Sigma to become a distributor of McWane's domestic DIPF rather than a competitor in that market.  Pursuant to this scheme and agreement, McWane and Sigma executed a Master Distribution Agreement, dated September 17, 2009 (the "MDA").

48.     The principal terms of the MDA were as follows:

a.     McWane would sell domestic DIPF to Sigma at a 20 percent discount off of McWane's published prices;

b.     Sigma would resell McWane's domestic DIPF at or near McWane's published prices for domestic DIPF, pocketing the difference;

c.     McWane would be Sigma's exclusive source for relevant domestic DIPF; and

d.     Sigma would resell McWane's domestic DIPF to waterworks distributors with the condition that the distributor agreed to purchase domestic DIPF exclusively from McWane or Sigma.

49.     An unwritten term of the MDA was that McWane would sell its domestic DIPF at or very near its published prices, thereby not undercutting Sigma's sales.  In the absence of a sufficiently profitable, collusive arrangement with McWane, Sigma would likely have independently entered the relevant domestic DIPF market in direct competition with McWane.

50.     Under the MDA, McWane controlled the price at which – and the customers to whom – Sigma could sell domestic DIPF.  Through the MDA, McWane transferred a share of its sales and monopoly profits in the domestic DIPF market to Sigma in exchange for Sigma's commitment to abandon its plans to separately enter the relevant domestic DIPF market as an independent competitor and to abide by McWane's monopoly pricing for domestic DIPF.

51.     Both McWane and Sigma entered into the MDA with the specific intent to maintain and share in McWane's monopoly profits in the relevant domestic DIPF market by, *inter alia*, maintain McWane's pricing and eliminating competition among themselves and excluding or inhibiting their rivals from the domestic DIPF market.

### E.     McWane Further Excluded  Star Pipe through Exclusive Dealing Policies

53.     Star Pipe announced its own entry into the relevant domestic DIPF market in June 2009.  McWane understood that Star Pipe's entry into the domestic DIPF market, if unobstructed, would place downward pressure on McWane's prices and market share for its domestic DIPF.

54.     According to the FTC Complaints, in addition to the MDA with Sigma, in response to Star Pipe's announcement and entry into the relevant domestic DIPF market, McWane also adopted restrictive and exclusive distribution policies (collectively, the "Exclusive Dealing Policies").  Through the Exclusive Dealing Policies, McWane intended and expected to impede and/or delay the ability of Star Pipe to enter and effectively compete in the relevant domestic DIPF market.

55.     Pursuant to the Exclusive Dealing Policies, McWane threatened waterworks distributors with delayed and/or diminished access to McWane's domestic DIPF, and the loss of accrued rebates on the purchase of McWane's domestic DIPF, if those distributors purchased domestic DIPF from Star Pipe.  Further, pursuant to the MDA with McWane, Sigma agreed to implement similar distribution policies.

56.     According to the FTC Complaints, McWane threatened some waterworks distributors with the loss of rebates in other product categories – such as ductile iron pipe, waterworks valves, and hydrants – if those distributors purchased domestic DIPF from Star Pipe.

Further, beginning in 2011, McWane changed its rebate structure for domestic DIPF to require waterworks distributors to make certain minimum, and high, shares of their total domestic DIPF purchases from McWane in order to qualify for rebates.

57.     The purpose and effect of the Exclusive Dealing Policies, instituted by the McWane and Sigma, has been and is to compel waterworks distributors to deal with them on an exclusive or nearly exclusive basis for their domestic DIPF business.

58.     The Exclusive Dealing Policies have had the intended effect of foreclosing or inhibiting Star Pipe from a substantial volume of sales opportunities with waterworks distributors, to the economic detriment of such distributors.  For example, despite Star Pipe's decision to enter the relevant domestic DIPF market in late 2009, McWane continued to garner and control more than 90 percent of all sales in the relevant domestic DIPF market.

59.     By foreclosing Star Pipe from a substantial volume of sales opportunities with waterworks distributors, the Exclusive Dealing Policies, and the McWane/Sigma MDA had the intent of and tended to minimize and/or delay Star Pipe's ability to effectively compete in the domestic DIPF market, and thereby to benefit consumers by, *inter alia*, constraining the prices of domestically produced DIPF.

60.     The Exclusive Dealing Policies have also raised barriers to entry into the relevant domestic DIPF market by other potential entrants, including SIP.  This conduct has contributed to McWane's monopolization of the relevant domestic DIPF market.

61.     The acts and practices of the McWane and Sigma, as alleged herein, have had the purpose, capacity, tendency, and effect of:

        a.      maintaining and stabilizing prices of DIPF in the relevant domestic DIPF markets;

b.      eliminating potential independent competition from Sigma in the relevant domestic DIPF market;

c.      impairing the competitive effectiveness of Star Pipe and others in the relevant domestic DIPF market; and

d.      raising barriers to entry for potential rivals in the relevant domestic DIPF market.

62.     The conduct of the McWane and Sigma was and is reasonably capable of making a significant contribution to the enhancement or maintenance of McWane's monopoly power in the relevant domestic DIPF market.

63.     The FTC Complaints allege that there are no legitimate pro-competitive efficiencies that justify the conduct of the McWane and Sigma as alleged herein, or that outweigh its anti-competitive effects.

**F.      The FTC Filed Complaints and Sigma Entered into a Consent Agreement**

64.     Defendants' conspiracies were revealed on January 4, 2012, when the FTC, following an investigation, filed the FTC Complaints against the Defendants in connection with their anti-competitive conduct.  The FTC Complaints document Defendants' illegal conspiracy, manipulation and inflation of DIPF prices, beginning in January 2008.

65.     In connection with the FTC's investigation, Sigma has entered into a Consent Agreement with the FTC concerning the allegations set forth in the Sigma FTC Complaint. Pursuant to the Consent Agreement, Sigma has agreed to refrain from participating in or maintaining any combination or conspiracy between any competitors to fix, raise or stabilize the prices at which DIPF are sold in the United States, or to allocate or divide markets, customers, or business opportunities.

## VIII.   MARKET FACTORS SUPPORTING CONSPIRACY

66.    The FTC identified multiple features of the relevant DIPF markets that facilitate collusion among Defendants, including product homogeneity, market concentration of DIPF suppliers, barriers to timely entry of new DIPF suppliers, inelastic demand at competitive prices, and uniform published prices.

67.    DIPF are commodity products produced to industry-wide standards.  Product homogeneity enhances Defendants' ability to collude on prices and to detect deviations from those collusive prices.

68.    In addition, the relevant DIPF markets are highly concentrated.  In 2008, the Defendants, collectively, were responsible for more than 90 percent of sales in the relevant DIPF markets.  The fact and existence of such a highly concentrated market acted to, and enhanced Defendants' ability and incentive to collude on prices.

69.    The DIPF market is subject to significant barriers to entry, including the need for a new entrant to develop a distribution network and a reputation for quality and service with waterworks distributors and end users.  Moreover, demand for DIPF is inelastic to changes in price at competitive levels.  DIPF represent a relatively small portion of the cost of materials of a typical waterworks project, and there are no widely used substitutes for DIPF products.

70.    Defendants publish nearly identical price books listing per-unit prices for each unique DIPF item carried by a given supplier, and periodically publish uniform multiplier discounts at which they offer to sell DIPF on a state-by-state basis.  By simplifying and standardizing published prices, the DIPF price list/multiplier format acted to, and enhanced the

Defendants' ability to collude on prices, and to detect potential deviations by co-conspirators from those collusive prices.

## IX.   PLAINTIFF AND THE CLASSES SUFFERED ANTITRUST INJURY

71.   Defendants' price-fixing conspiracy had the following effects, among others:

a.     price competition has been restrained or eliminated with respect to DIPF;

b.     the prices of DIPF have been fixed, raised, maintained, and/or stabilized at artificially inflated levels; and

c.     direct purchasers of DIPF have been deprived of free and open competition.

72.   During the Class Periods, Plaintiff and the members of the Classes have paid supra-competitive prices for DIPF.

73.   By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for DIPF than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## X.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

74.   Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy and price manipulation alleged herein prior to the disclosure by the FTC on January 4, 2012.

75.   Since the start of the All DIPF Class Period in January 2008, Defendants and their co-conspirators have committed continuing violations of the antitrust and unfair competition

laws, resulting in damages and monetary injury to Plaintiff and members of the Classes. These violations constituted and continue to constitute injurious acts.

76.     In addition, the illegal agreements, understandings and conspiracies of Defendants and their co-conspirators were kept secret. As a result, Plaintiff and members of the Classes were unaware of Defendants' unlawful conduct alleged herein, and did not know that they were paying manipulated and artificially high prices for DIPF in the United States during the Class Periods. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

77.     By its very nature, the conspiracies by Defendants and their co-conspirators were inherently self-concealing. Plaintiff and members of the Classes did not discover, nor could they have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust and unfair competition laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

78.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed by, *inter alia*:

a.      communicating in secret to discuss prices, customers, and markets of DIPF in the United States;

b.      using the DIFRA to exchange information regarding sales and pricing; and

c.      sending communications in a manner, or taking actions in a manner designed to hide the origin or purpose of the communication or action.

79.     Because the alleged conspiracies were both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Classes had no

17

knowledge of the alleged conspiracies, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until January 2012, when reports of the FTC's investigations into anti-competitive conduct concerning DIPF were first publicly disseminated.

80.     As a result of Defendants' fraudulent concealment of their conspiracies, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the members of the Classes have alleged in this Complaint.

## XI.     INTERSTATE COMMERCE AND ANTITRUST INJURY TO PLAINTIFFS AND THE CLASS

81.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of, interstate trade and commerce of the United States, in that, *inter alia*:

a.     Defendants and their co-conspirators have sold DIPF throughout the United States;

b.     Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell DIPF throughout the United States; and

c.     in furtherance of the conspiracies alleged herein, Defendants have traveled between states and/or have exchanged communications through interstate wire communications and via U.S. mail.

82.     Defendants' unlawful conduct therefore has had a direct, substantial and foreseeable impact and effect on interstate commerce.  Defendants' unlawful conduct has also had a direct and adverse impact on competition in the United States in that, absent Defendants' collusion, the prices paid for DIPF would not have been manipulated and artificially inflated, and Plaintiff and other members of the Classes would have paid lower, competitive prices for DIPF.

83.     The conspiracies alleged herein have affected millions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by manipulating and artificially increasing prices paid by Plaintiff and other entities, who are themselves engaged in commerce.  As a direct result of Defendants' unlawful conduct, Plaintiff and the Class have therefore suffered injury to their business and property.

## XII.    CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23 of the Federal Rules of Civil Procedure, seeking damages and equitable and injunctive relief on behalf of the following Classes:

a.      the All DIPF Class, comprised of:

All persons and entities that, during the All DIPF Class Period, purchased DIPF at supra-competitive prices directly from McWane, Sigma, Star Pipe and/or their co-conspirators.  Excluded from the All DIPF Class are McWane, Sigma and Star Pipe, their co-conspirators and each of their respective their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

b.      the Domestic DIPF Class, comprised of:

All persons and entities that, during the Domestic DIPF Class Period, purchased domestic DIPF at supra-competitive prices directly from a manufacturer of domestic DIPF.  Excluded from the Domestic DIPF Class are McWane and Sigma, their co-conspirators and each of their respective their officers, employees, agents, representatives, parents, subsidiaries and affiliates.

85.     Plaintiff reserves the right to amend the Class definitions prior to certification.

86.     Plaintiff does not know the exact size of either of the Classes.  However, due to the nature of the trade and commerce involved, there are thousands of Class members in each Class, geographically dispersed across the United States, and therefore joinder is impracticable.

87.     Class members in each Class are identifiable from information and records in the possession and/or control of the Defendants.

88.     There are questions of law and fact common to each Class.  These common questions relate to the existence of the conspiracies alleged, the conduct of the Defendants in agreeing to participate and participating in the conspiracies, and to the type and common pattern of injury sustained as a result thereof.  These common questions include but are not limited to:

a.      whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices charged for DIPF sold in the United States;

b.      the identity of participants in such conspiracies;

c.      the duration of the conspiracies alleged in this Complaint, and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of such conspiracies;

d.      whether Defendants took steps to actively conceal the conspiracies from Plaintiff and other members of the Classes;

e.      whether the alleged conspiracies violated the Sherman Act, as alleged in the First Claim for Relief;

f.      whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Classes, thereby entitling Plaintiff and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Second Claim for Relief;

g.      the effect of Defendants' conspiracy on the prices of DIPF sold by the relevant Defendants during each of the Class Periods;

h.      whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Classes; and

i.      the appropriate measure of damages sustained by Plaintiff and other members of the Classes.

89.     Plaintiff's claims are typical of the claims of other members of the Classes, and Plaintiff will fairly and adequately protect the interests of those Classes.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes.

90.     Plaintiff has retained competent counsel, experienced in the prosecution of complex antitrust class action litigation.

91.     The prosecution of separate actions by individual members of the Classes, located around the country, would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

92.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

93.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons and entities to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

94.     Class treatment will also permit the adjudication of relatively small claims by members of the Classes that otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

95.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

96.     The Defendants and their unnamed co-conspirators entered into and engaged in a continuing conspiracies in unreasonable restraint of interstate trade and commerce in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

97.     During the All DIPF Class Periods, as alleged above, the Defendants and their co-conspirators combined, conspired, and agreed to artificially inflate and maintain prices for DIPF. During the Domestic DIPF Class Periods, as alleged above, McWane and Sigma and their co-conspirators combined, conspired, and agreed to artificially inflate and maintain prices for domestic DIPF.  Through their positions as the major and predominate suppliers of DIPF in the United States, these Defendants could and did control the relevant markets for both foreign and domestic DIPF in the United States.

98.     The conspiracies consisted of continuing agreements, understandings, and/or concerted actions between and among these Defendants and their co-conspirators, in furtherance of which these Defendants artificially inflated, fixed and maintained DIPF prices.  Accordingly, these Defendants' conspiracies are *per se* violations of Section 1 of the Sherman Act.

99.     These Defendants' conspiracies, and resulting impact on the prices for DIPF during the Class Periods, occurred in or affected interstate commerce.

100.    As a direct, reasonably foreseeable, and substantial result of these Defendants'
unlawful conduct, Plaintiff and members of the Classes have suffered injury to their business or
property.

101.    Plaintiff and members of the Classes are each entitled to treble damages for the
violations of the Sherman Act alleged herein.

**SECOND CLAIM FOR RELIEF**
**RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT**

102.    Plaintiff incorporates by reference and realleges the preceding allegations as
though fully set forth herein.

103.    Defendants benefitted from their unlawful acts through, *inter alia*, the receipt of
overpayments by and other benefits from Plaintiff and other members of the Classes.  It would
be inequitable for Defendants to retain the benefit of these overpayments and other benefits that
were conferred by Plaintiff and members of the Classes, or paid to Defendants pursuant to or as
the result of the unlawful conduct described herein.

104.    Plaintiff and members of the Classes are entitled to the establishment of a
constructive trust consisting of the overpayments and other benefits to Defendants.  These
Defendants should contribute sums equal to the amount of all such overpayments and other
benefits each received as a result of its unlawful conduct, schemes and agreements, from which
Plaintiff and other members of the Classes may make claims on a pro-rata basis for restitution.

**RELIEF SOUGHT**

Accordingly, Plaintiff demands judgment against Defendants and each of them as
follows:

A. determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as class representative and Plaintiff's counsel as counsel for the Classes;

B. adjudging that Defendants have violated Section 1 of the Sherman Act;

C. awarding to Plaintiff and the Classes three-fold the damages to be proved at trial;

E. awarding to Plaintiff and the Classes their costs of the suit, including reasonable attorneys' fees; and

F. affording to Plaintiff and the Classes such other and further relief as may be just and proper, including disgorgement and appropriate injunctive relief against the Defendants.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues triable by a jury.

Dated: February 6, 2012

SEEGER WEISS LLP

By: /s/ *Christopher A. Seeger*
CHRISTOPHER A. SEEGER
Stephen A. Weiss
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, New Jersey 07102
(973) 639-9100

Karen L. Morris
Patrick F. Morris
Morris and Morris LLC
Counselors at Law

4001 Kennett Pike Suite 300
Wilmington, DE 19807

Attorneys for Plaintiff